# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CP-00434-COA

ERIC LAQUINNE BROWN A/K/A ERIC L. BROWN                    APPELLANT

v.

STATE OF MISSISSIPPI                                         APPELLEE


DATE OF JUDGMENT:              03/17/2014
TRIAL JUDGE:                   HON. THOMAS J. GARDNER III
COURT FROM WHICH APPEALED:     PONTOTOC COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        ERIC LAQUINNE BROWN (PRO SE)
ATTORNEYS FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                               BY: JOHN R. HENRY JR.
                                   SCOTT STUART
NATURE OF THE CASE:            CIVIL - POSTCONVICTION RELIEF
TRIAL COURT DISPOSITION:       DENIED MOTION FOR POSTCONVICTION
                               RELIEF
DISPOSITION:                   AFFIRMED - 08/11/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

EN BANC.

MAXWELL, J., FOR THE COURT:

¶1.     Since 1999, Eric LaQuinne Brown has been serving a life sentence for the murder of

his girlfriend and a twenty-year sentence for the manslaughter of his unborn child.  In 2014,

he filed his fourth motion for postconviction relief (PCR).  In his latest motion, he cites a

2009 Mississippi Supreme Court case, *Sanders v. State*, 9 So. 3d 1132, 1136 (¶16) (Miss.

2009), to argue his convictions must be reversed.  He insists, under *Sanders*, his fundamental

rights were violated because the trial court did not conduct an on-the-record competency

hearing before accepting his plea, despite having ordered Brown to undergo a psychological exam. But *Sanders* and its progeny do not apply retroactively to undo Brown's 1999 guilty plea.

¶2.     What the record shows is that Brown *was* in fact deemed competent by the psychologist who evaluated him. And the record shows the trial judge indeed considered the psychologist's report, and questioned Brown about his competency, before accepting Brown's guilty plea. Furthermore, neither Brown nor his counsel ever asserted Brown was incompetent to stand trial. So from the face of Brown's own motion and the underlying criminal record, Brown failed to show the absence of a formal competency hearing led to a denial of his due-process rights. We thus affirm the dismissal of this PCR claim.

¶3.     Because Brown also failed to produce any "newly discovered evidence" to overcome the successive-writ and time-bars, we also affirm the dismissal of his other claims.

**Background Facts and Procedural History**

### I.      *Murder of Shorelanda and Her Unborn Child*

¶4.     In January 1999, Brown was involved in two relationships with two different women. One of those women was Tennille Brown, his wife, with whom he had at least one child. The other was Shorelonda Moore, his girlfriend. Brown and Shorelanda already had one child together. And Shorelanda was several months pregnant with another of Brown's children. Tennille and Shorelanda did not get along, and the situation was stressful for Brown. In early January 1999, Brown allegedly spoke with friends about getting rid of

2

Shorelanda, as she was causing trouble between him and his wife.

¶5.     On January 22, the situation came to a head.  The day of the murder, Brown called Shorelanda at her job at McDonald's several times.  Witnesses told law enforcement that Brown and Shorelanda made plans to meet once she got off work.  Shorelanda believed they were going to spend the weekend together in Memphis, Tennessee.  Brown admitted to law enforcement he met Shorelanda behind a restaurant in Pontotoc after she got off work.  The two sat in Shorelanda's car, as they often did.  But that day their conversation took a dark turn.  Shorelanda and Brown began arguing because Shorelanda was upset that Brown had married Tennille only a few days earlier.  As the argument escalated, according to Brown, he began to shake her.  Soon, Shorelanda was unresponsive.

¶6.     Brown returned home and told Tennille he had killed Shorelanda.  He then told his wife they were leaving for Memphis to ditch Shorelanda's body.  Tennille put the children in the car, and Brown loaded a five-gallon gas can in the trunk.  Tennille dropped Brown off at Shorelanda's car and followed Brown as he drove Shorelanda's body to Memphis.  Once in Memphis, he drove Shorelanda's car down an alley.  He parked the car, used the gas can he had brought from Pontotoc to douse the vehicle, and set it and Shorelanda's body on fire.

¶7.     Early the next day, a man found Shorelanda's car smouldering in the alley. Memphis police discovered Shorelanda's body in the car. Her pants and underwear were pulled below her hips. Her shirt and bra were pulled up, and her bra was partially around her throat. The medical examiner later determined Shorelanda's cause of death was strangulation.  The

3

ligature marks on her neck matched the pattern of her bra. Medical examiners also determined Shorelanda was approximately twenty-eight weeks pregnant.

¶8. Law enforcement quickly caught up with Brown. Both he and Tennille spun a story about being in Tupelo. But that was determined to be a lie. Tennille eventually gave several statements to officers, each incriminating her and her husband in some way. Police found physical evidence that incriminated Brown. And eventually, Brown gave a voluntary statement to law enforcement. Both Brown and Tennille were indicted for Shorelanda's murder and the manslaughter of her unborn child.

## II. *Psychological Evaluation*

¶9. On July 20, 1999, Brown filed a motion for psychiatric assistance. He claimed he intended to use the psychiatric report as mitigation should he be convicted and to determine if he was able to form the necessary intent for murder. *Significantly, Brown's motion did not claim he was presently incompetent.* The trial court ordered Brown to undergo an examination at the Mississippi State Hospital. This exam was to assess his mental capability to stand trial, his need for inpatient hospitalization, and for the hospital to do a psychological exam. *The order did not state that reasonable grounds existed to believe Brown was presently incompetent.* This exam never occurred because Brown's attorney failed to give the hospital the requested and required materials.

¶10. On November 12, 1999, the State filed for a psychiatric examination to determine if Brown was competent to stand trial, able to discern the difference between right and wrong,

able to form the necessary intent, and if "under the conditions he suffered whether malice could be implied 'where no considerable provocation appears.'" The State further noted Brown had claimed past mental illnesses and had indicated a "mental-type" defense would be used in his trial. The trial judge ordered Brown undergo an evaluation to be performed by Dr. Criss Lott.

¶11. Dr. Lott conducted his exam on November 14, 1999. And he found to a reasonable degree of psychological certainty that Brown had "the sufficient present ability to confer with his attorney with a reasonable degree of rational understanding and he has a good factual and rational understanding of the nature and object of the legal proceedings against him."

### III. Plea Colloquy

¶12. On November 29, 1999, Brown pled guilty to both murder and manslaughter charges. At the plea hearing, Brown denied being under the influence of drugs or alcohol. He denied being treated for any drug or alcohol abuse. And he specifically denied he was suffering any psychiatric illness or mental disease. Brown told the judge he understood the nature of the charges against him and the consequences of pleading guilty.

¶13. The State relayed, at length, the factual basis of the crimes and the evidence the State would prove at trial. The trial judge asked Brown if the State's evidentiary proffer was substantially correct. Brown answered that it was.

¶14. The trial judge asked Brown if he understood what was taking place that day. And Brown said he did. Brown did not have any questions about the day's proceedings, nor did

5

he have any questions for the judge. *Nothing from the hearing transcript indicates the trial judge should have been alerted Brown might be suffering from mental issues.*

¶15.   The State also noted for the trial court that Brown's attorney had filed for a psychiatric exam, and after that exam, Brown had been found competent to stand trial. The trial judge mentioned he had seen a copy of the doctor's report. And he asked the State to ensure a copy would be filed in the court's file after the proceedings had concluded. *Neither Brown nor his attorney voiced any concerns or objections to the conversation involving Brown's prior competency determination.* The trial judge then found that Brown "knowingly, understandingly, freely and voluntarily" pled guilty. The judge sentenced Brown to serve a life sentence for the murder of Shorelanda and to serve twenty years for the manslaughter of their unborn child, with both sentences to run concurrently.

### IV.   Postconviction Filings

¶16.   Fifteen years have passed since Brown's guilty plea. Since then, Brown filed three PCR motions with the trial court, one of which was appealed to this court. *Brown v. State*, 907 So. 2d 979, 981 (¶9) (Miss. Ct. App. 2005) (finding Brown's motion both subsequent-writ and time-barred). He has also filed no fewer than five motions in the Mississippi Supreme Court seeking various relief, all of which have been denied or dismissed. *Brown v. State*, 2000-CP-01799 (order dismissing case dated Mar. 22, 2001); *Brown v. State*, 2002-M-01821 (order denying motions dated Jan. 21, 2004); *Brown v. State*, 2012-M-01132 (order denying motions dated Sept. 19, 2012); *Brown v. State*, 2013-M-02102 (order denying

6

motion dated Jan. 23, 2014).

¶17.    The present appeal is from the dismissal of Brown's fourth PCR motion, filed in February 2014.  In this motion, Brown claims for the first time the lack of a competency hearing was a violation of his due-process rights.  He also suggests he has "newly discovered evidence."  Finally, he claims there was an insufficient factual basis for the trial court to accept his guilty plea.

**Discussion**

¶18.    Brown concedes his present PCR motion is well outside the three-year time-bar and is successive.  *See* Miss. Code Ann. § 99-39-5(2) (Supp. 2014); Miss. Code Ann. § 99-39-23(6) (Supp. 2014).  But he asserts these bars do not apply due to the "fundamental rights" exception of *Rowland v. State*, 42 So. 3d 503, 507 (¶12) (Miss. 2010), and because he has newly discovered evidence, Miss. Code Ann. § 99-39-5(2)(a)(i); Miss. Code Ann. § 99-39-23(6).

### I.    Lack of a Competency Hearing

¶19.    Brown is correct that the due-process right not to stand trial or be convicted while incompetent is a fundamental right not subject to the procedural bars of the Mississippi postconviction-relief statutes.  *See Smith v. State*, 149 So. 3d 1027, 1031 (¶8) (Miss. 2014) (citations omitted).  But having evaluated the merits of Brown's allegations, we find he has failed to establish a claim that this right was violated.  *See Smith v. State*, 129 So. 3d 243, 245 (¶5) (Miss. Ct. App. 2013) (citation omitted) ("We affirm dismissals or denials of PCR

7

motions when the movant fails to demonstrate a claim procedurally alive substantially showing the denial of a state or federal right.").

¶20.    In arguing his conviction must be vacated due to the lack of a formal competency hearing, Brown relies on the 2009 Mississippi Supreme Court ruling in *Sanders*, 9 So. 3d at 1136 (¶16).  In that opinion, the supreme court strictly interpreted Uniform Circuit and County Court Rule 9.06[1] to mandate a competency hearing in every case where the trial court has ordered a psychological exam.  *Sanders*, 9 So. 3d at 1136 (¶16).  Brown reasons that, since he underwent a court-ordered mental exam, the trial court had to conduct a formal competency hearing before accepting his guilty plea.  And the court's failure to do so entitles him to a new trial.

¶21.    But *Sanders* and the later cases that have relied on *Sanders*[2] do not apply to Brown's 1999 guilty plea *because they are not retroactive*.

¶22.    In *Teague*, the United States Supreme held a new rule of constitutional law will not be applied retroactively to a case on habeas review unless it falls within one of two limited exceptions:

> The first exception [is] that a new rule should be applied retroactively if it places certain kinds of primary, private individual conduct beyond the power

---

[1] Rule 9.06 directs that, "[i]f before or during trial the court . . . has reasonable ground to believe that the defendant is incompetent to stand trial, the court shall order the defendant to submit to a mental examination[.]"  And "[a]fter the examination the court shall conduct a hearing to determine if the defendant is competent to stand trial."  URCCC 9.06.

[2] *Coleman v. State*, 127 So. 3d 161 (Miss. 2013); *Smith v. State*, 149 So. 3d 1027 (Miss. 2014).

of the criminal law-making authority to proscribe[.] . . . The second exception [is] that a new rule should be applied retroactively if it requires the observance of those procedures that . . . are implicit in the concept of ordered liberty.

The Supreme Court later pointed out in *Sawyer v. Smith*, 497 U.S. 227, 234 (1990), that "[t]he principle announced in *Teague* serves to ensure that gradual developments in the law over which reasonable jurists may disagree are not later used to upset the finality of state convictions valid when entered."

¶23. Our state supreme court adopted the *Teague* analysis in *Manning v. State*. As our supreme court put it, "we take this opportunity to expressly state that in the future this Court will continue to apply the very limited retroactive application standard set forth by the United States Supreme Court in *Teague v. Lane*." *Manning v. State*, 929 So. 2d 885, 900 (¶42) (Miss. 2006). In *Manning*, the court discussed in-depth the United States Supreme Court's holdings in both *Teague* and *Schriro v. Summerlin*, 542 U.S. 348 (2004). The *Schriro* Court delineated a distinction between substantive and procedural rules and their retroactive applicability, explaining:

> When a decision of this Court results in a "new rule," that rule applies to all criminal cases still pending on direct review. As to convictions that are already final, however, the rule applies *only in limited circumstances*. New substantive rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms . . . as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish. Such rules apply retroactively because they necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal or faces a punishment that the law cannot impose upon him.
>
> New rules of procedure, on the other hand, generally do not apply

9

retroactively. They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. Because of this more speculative connection to innocence, we give retroactive effect to only a small set of watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding. That a new procedural rule is "fundamental" in some abstract sense is not enough; the rule must be one without which the likelihood of an accurate conviction is seriously diminished. This class of rules is extremely narrow[.]

*Schriro*, 542 U.S. at 351-52 (emphasis added and internal quotations and citations omitted).

¶24. A rule is substantive if it "alters the range of conduct or the class of persons that the law punishes," whereas a rule is procedural if it "regulate[s] only the manner of determining the defendant's culpability." *Id.* at 353. In *Sanders*, the supreme court interpreted Rule 9.06 to mandate a formal competency hearing "once a trial court orders a psychiatric evaluation to determine competency to stand trial." *Sanders*, 9 So. 3d at 1136 (¶16). Because this ruling was procedural in nature, it does not apply retroactively.

¶25. The *Sanders* rule did not change the "range of conduct" punishable by statute. Nor did it suddenly place Brown in a category of persons who could not be punished by law. The *Sanders* ruling simply regulated the trial court's procedure for determining a defendant's competency. Additionally, the rulings of *Sanders* and its progeny could hardly be considered a "watershed" rule of criminal procedure. The strict interpretation of Rule 9.06 did not make prior cases involving competency issues fundamentally unfair, and it did not affect the accuracy of criminal proceedings. As the U.S. Supreme Court noted in *Schriro*, the class of procedural rules applied retroactively should be construed extremely narrowly. *Schriro,* 542

10

U.S. at 352. It is paramount to limit retroactive application of new rules so as to not "upset the finality of state convictions" that were valid when entered. *Sawyer*, 497 U.S. at 234.

¶26. In this case, to apply *Sanders* retroactively to Brown—as the dissent suggests we should—would require the trial judge to have been clairvoyant in 1999 and accurately predict what the Mississippi Supreme Court would do ten years later in *Sanders*.[3]

¶27. Also, Brown had been determined competent under the *Dusky* standards[4] by a competent psychologist. And the judge, defense counsel, prosecutor, and Brown knew that at the plea hearing.

---

[3] The dissent notes that the supreme court applied *Sanders* retroactively in *Goodin v. State*, 102 So. 3d 1102, 1118-19 (¶¶48-50) (Miss. 2012). However, in *Goodin*, the supreme court's application of *Sanders* dealt solely with the issue of Goodin's trial counsel's performance under *Strickland v. Washington*, 466 U.S. 668 (1984). The supreme court found that Goodin's attorney was deficient in not following the procedure set forth in Rule 9.06; the court made no finding as to the trial court's errors in not conducting a competency hearing. Furthermore, *Goodin* involved a conviction for capital murder. The supreme court

> will review an appeal from a capital murder conviction and death sentence with "heightened scrutiny" under which all bona fide doubts are resolved in favor of the accused. *Porter v. State*, 732 So. 2d 899, 902 (Miss. 1999). Further, [the supreme court] is cognizant of the fact that what may be harmless error in certain situations becomes reversible error where the penalty is death. *Id.*

*Simmons v. State*, 805 So. 2d 452, 472 (¶26) (Miss. 2001). The present case and *Goodin* are not analogous.

[4] The standard for competency to stand trial set forth in *Dusky v. United States* is "whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States* 362 U.S. 402, 402 (1960) (per curiam).

11

¶28.	Competency is to be presumed until the defendant proves by "substantial evidence that [he] is mentally incompetent to stand trial." *Evans v. State*, 725 So. 2d 613, 660 (¶180) (Miss. 1997) (quoting *Medina v. California*, 505 U.S. 437, 448 (1992)). Defense counsel never raised the issue of Brown's competency. And his motion for a mental exam dealt solely with Brown's mental ability to form the necessary intent to commit murder. Nothing occurred during the plea hearing to raise any issues about Brown's competency. And any possible doubt of Brown's competency was resolved when a licensed psychologist found him to be competent after a thorough examination.

¶29.	Further, defense counsel raised no objection to proceeding without a formal hearing. And had some sort of formal competency hearing occurred, it is reasonable to conclude the State would have introduced Dr. Lott's written report into evidence. Defense counsel would have voiced no objection, as he did not object during the plea hearing. The State and defense would have then rested. This is particularly so since Brown had sworn under oath that he had never been treated for any mental disease or psychiatric illness and fully understood what was occurring in the courtroom. Under such circumstances, mandating a formal competency hearing before proceeding with a guilty plea would be placing form over substance.

¶30.	Brown's guilty plea was valid when entered. He was informed of all of the rights he forfeited by pleading guilty. A factual basis of the crimes was recited. And he was told the minimum and maximum sentences he faced by pleading guilty. He told the trial judge he was not under the influence of drugs or alcohol. Brown maintained he was satisfied with his

12

attorney's performance and advice. And he represented that he had not been threatened or coerced into pleading guilty. Importantly, Brown denied any history of mental disease or psychiatric illness. And neither he nor his attorney voiced any objections to the State's statement that Dr. Lott found Brown to be competent. Having heard this, and personally observing Brown's demeanor in court, the judge found Brown's plea to be knowing, voluntary, and intelligent. And now, fifteen years later, Brown presents no persuasive reason for us to doubt the trial judge's finding.

## II. *"Newly Discovered Evidence"*

¶31. Alternatively, Brown asserts he is entitled to relief based on "newly discovered evidence." Following his convictions, Brown sued three Ponotoc police officers involved in his arrest. *See Brown v. Sudduth*, 675 F.3d 472 (5th Cir. 2012). According to Brown, certain facts came to light during the 2008 federal civil trial that, had he had known them back in 1999, he would not have pled guilty.

¶32. Setting aside the fact Brown waited *six years* after this trial to file his "newly discovered evidence" claim, none of this evidence meets the definition of "newly discovered." "The term 'newly discovered evidence' refers to evidence, that is, an exhibit, testimony, or some other information that could have been offered as evidence in the defendant's trial but was not offered *because it was not reasonably discoverable at the time of the trial*." *Pickle v. State*, 942 So. 2d 243, 246 (¶12) (Miss. Ct. App. 2006) (emphasis added); *see also* Miss. Code Ann. § 99-39-5(2)(a)(i) (requiring the defendant, to overcome

13

the procedural bar, to demonstrate "he has evidence, *not reasonably discoverable at the time of trial*, which is of such nature that it would be practically conclusive that, if it had been introduced at trial, it would have caused a different result in the conviction or sentence" (emphasis added)); Miss. Code Ann. § 99-39-23(6) (same). And Brown has failed to show that the evidence he refers to as "new" was not reasonably discoverable in 1999.

¶33. Brown claims the first piece of "newly discovered evidence" arose when one of the officers testified at trial in the 2008 lawsuit. The issue in that suit was if and when the Pontotoc police had probable cause to arrest him. *Brown*, 675 F.3d at 475. The arresting officer testified that, when the Ponotoc police first caught up with Brown and Tennille, it was still unclear *where* Shorelanda was murdered—in Pontotoc or Memphis. *Id.* at 478. The arresting officer testified during her initial detention Tennille gave a statement to Pontotoc police. And this statement led them to reasonably believe Shorelanda was already dead before Moore drove her car to Memphis, which is why the Pontotoc police were the ones who arrested Brown and Tennille for murder. *See id.*

¶34. In his PCR motion, Brown claims this was the first time he realized the police had relied on Tennille's statement to establish the murder occurred in Ponotoc. Brown claims Tennille had lied to the police, when they first questioned her—and both the police and prosecutor knew she had lied. And had he known the prosecution was relying on this "false" evidence, he would not have pled guilty. To support this claim, Brown points to a 1999 police report—a report he fails to prove was newly discovered—that says Tenille initially

14

lied to cover for Brown before failing a polygraph and coming clean about his guilt in the murder. Though the report mentions nothing about the details of Tenille's initial false statement, Brown stretches the report, attempting to create a nonbarred claim. As he views it, the report's general statement about Tenille's initial protection of him is somehow proof she was lying when she admitted he had killed Shorelanda in Pontotoc County. Thus, officers—knowing about this lie—arrested him without sufficient probable cause to arrest him for a Pontotoc County murder.

¶35. Even if the circuit judge had accepted Brown's theory, Brown fails to show how an initial lack of probable cause to arrest equates to his innocence in the murder case. As the Fifth Circuit put it in one of Brown's several appeals of his federal lawsuit, "it can hardly be said that the proof required to establish Brown's unlawful arrest claim necessarily would imply the invalidity of his underlying murder conviction." *Brown v. Sudduth*, 255 F. App'x 803, 806 (5th Cir. 2007) (unreported) (citing *Brown v. Edwards*, 721 F.2d 1442, 1448 (5th Cir. 1984)). So his claimed newly discovered evidence is immaterial here. *See Crawford v. State*, 867 So. 2d 196, 204 (¶9) (Miss. 2003) (requiring showing that newly discovered "evidence is material and is not merely cumulative or impeaching" in order to be granted a new trial).

¶36. Still, even in light of his claimed new evidence, the record shows Brown admitted to law enforcement he met Shorelanda behind the Pontotoc restaurant. And once inside Shorelanda's car, the two began arguing about Brown recently marrying Tennille days

15

earlier. *According to Brown, he began to shake her, and Shorelanda became unresponsive.* There is also additional evidence Brown fails to consider. The Pontotoc McDonald's manager had told an investigator that Moore had worked the previous day during which Brown had telephoned the restaurant several times. *Brown*, 675 F.3d at 475. Her manager also told the investigator that Brown and Moore were to meet after Moore's shift. Moore and Brown had plans to leave town for the weekend. *Id.* Brown's neighbor reported Brown was away from home that night, and officers did not find Brown at home Saturday morning. And Shorelanda's strangled and burned body was still clothed in her McDonald's uniform when discovered in Memphis. *Id.* So it is certainly not practically conclusive that, if Brown had opted for trial and pitched his supposed new evidence, it would have caused a different result in the conviction. *See Crawford*, 867 So. 2d at 204 (¶10) ("Evidence is material only if there is a reasonable probability (i.e., 'probability sufficient enough to undermine confidence in the outcome') that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (quoting *De La Beckwith v. State*, 707 So. 2d 547, 572 (Miss. 1997))).

¶37. The judge was also not swayed by Brown's second piece of alleged newly discovered evidence—a threatening letter from Shorelanda to Moore, which was part of the criminal file subpoenaed for the 2008 civil lawsuit. Brown claims, had he known the police had this letter in their possession, he would not have pled guilty. But by his own admission, Brown knew about the letter before he pled guilty. In fact, he asserts he *told* the Pontotoc police about the

16

letter's existence back in 1999. So this evidence could have easily been discovered prior to trial.

¶38. Because, from the face of his motion, none of Brown's "newly discovered evidence" was really newly discovered, the trial court did not err when it summarily dismissed this claim.

### III. Factual Basis to Support Guilty Plea

¶39. Finally, Brown claims there was insufficient evidence to establish a factual basis for his plea. *See* URCCC 8.04(A)(3) (requiring that, "[b]efore the trial court may accept a plea of guilty, the court must determine . . . that there is a factual basis for this plea"). Brown argues this claim also presents a fundamental-rights exception to the procedural bars under *Rowland*, 42 So. 3d at 507 (¶12), because "a factual basis is an essential part of the constitutionally valid and enforceable decision to plead guilty," *Carter v. State*, 775 So. 2d 91, 98 (¶28) (Miss. 1999) (citation omitted).

¶40. Bars or no bars, Brown's no-factual-basis claim clearly lacks merit. Brown contends there was no factual basis for his plea because he never specifically admitted he strangled Shorelanda with a bra. But a factual basis is not insufficient simply because the defendant does not confess each gory detail of the crime. *See Corley v. State*, 585 So. 2d 765, 767 (Miss. 1991) (rejecting the defendant's "view that only words spoken from his own mouth can form the requisite factual predicate"); *see also Gazzier v. State*, 744 So. 2d 776, 779 (¶7) (Miss. 1999) ("The law does not require that a defendant admit every aspect of a charge

17

against him. Instead, a guilty plea will be considered valid even though the defendant makes only a bare admission of guilt.").

¶41. Brown admitted he deliberately killed Shorelanda—the crime for which he was indicted. As part of the recitation of facts, the prosecutor told the court that Brown had admitted he was in the car with Shorelanda behind the restaurant in Ponotoc—a fact other witnesses confirmed. Brown also admitted he argued with Shorelanda, that he shook her until she was no longer responsive, and that he then went home and told his wife that he had killed Shorelanda and needed to dispose of her body. Brown then drove Shorelanda's body to Memphis, where he attempted to burn Shorelanda's car. The police later discovered Brown's discarded burnt clothing along the road between Memphis and Ponotoc. They also found clippings of Brown's singed hair, which he had trimmed off in his bathroom. And the autopsy report showed Shorelanda had been strangled and the ligature marks on her neck were consistent with her bra, which had been pulled around her neck.

¶42. From this, we find a more-than-sufficient factual basis under Rule 8.04(A)(3) for the trial court to accept Brown's guilty plea. Therefore, we affirm.

¶43. **THE JUDGMENT OF THE PONTOTOC COUNTY CIRCUIT COURT DISMISSING THE MOTION FOR POSTCONVICTION RELIEF IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PONOTOC COUNTY.**

**IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, FAIR AND WILSON, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., DISSENTS WITH SEPARATE WRITTEN OPINION. LEE, C.J., NOT PARTICIPATING.**

**JAMES, J., DISSENTING:**

¶44. Because the trial court failed to conduct a competency hearing mandated by Uniform Rule of Circuit and County Court Practice 9.06, after ordering two separate psychiatric evaluations, only one of which was actually performed, I respectfully dissent from the majority opinion. I would reverse the decision of the trial court, vacate Brown's conviction, and he must be either retried or institutionalized following a mental evaluation and competency hearing under Rule 9.06. *See Smith v. State*, 149 So. 3d 1027, 1035 (¶19) (Miss. 2014).

¶45. On July 20, 1999, Brown filed a motion for psychiatric assistance. On the same day, the trial court entered an order for a psychological examination, compelling Brown to undergo an examination at the psychiatric department of the Mississippi State Hospital. The order provided in part: "The Court has sufficient cause to believe that a psychological report on the defendant would be helpful to the Court in determining what disposition should be made of the above stated case." The order requested that the "psychiatrists include in their report: (1) a psychological analysis of [Brown]; (2) an opinion as to whether [Brown] is mentally capable of standing trial; and (3) whether [Brown] is in need of in-patient hospitalization."

¶46. On October 25, 1999, a staff psychiatrist at the Mississippi State Hospital faxed a request for information to Brown's attorney, James O. Ford. The request included information such as the trial court's order for evaluation, the motion requesting the evaluation or statement giving reasons why the examination was sought, prior psychiatric/psychological

19

examinations or treatment, a statement describing the defendant's behavior in jail, a list of the medications the defendant was taking, and names of family members. The request stated that once the information was received, the hospital would schedule the evaluation. It appears that the Mississippi State Hospital never received the requested information, and the evaluation was not scheduled. However, it is clear that this court-ordered psychological examination never occurred.

¶47. On November 12, 1999, the State filed a motion for a psychiatric examination. The State moved for a psychiatric examination of Brown

> for the purpose of determining whether, by reason of some defect, disease, or condition of the mind or memory (1) the defendant is able to comprehend the nature of the charges against him and rationally aid in his defense; and (2) at the time of the commission of the crime herein charged, the defendant was of such mental capacity as to distinguish between right and wrong; [and] (3) whether under the conditions [the] defendant was being subjected to on and before January 22, 1999, he was able to form the intent necessary under the law to be responsible for the act of which he is accused; and (4) to determine as to the murder charges whether[,] as to this defendant under the conditions he suffered[,] . . . malice could be implied "where no considerable provocation appears."

The State alleged the cause in support of the motion was that "the defendant may claim in the past he has exhibited a history of some degree of mental illness" and "that the defendant has indicated through his attorney that a mental type defense will be used in the trial of this matter." Further, the motion provided "that it is necessary for the State to examine the capacity of the defendant by a competent mental health professional in order to properly try this cause."

20

¶48. On the same day, the trial court granted the State's motion and entered an order compelling Brown to undergo a competency exam to be performed by Dr. Criss Lott. The order provided in part:

> The cause this day came for hearing on Motion of the State of Mississippi for an Order for a psychiatric examination of the above named defendant in this case, for the purpose of determining whether, by reason of some defect, disease, or condition of the mind or memory (1) the defendant is able to comprehend the nature of the charges against him and rationally aid in his defense; and (2) at the time of the commission of the crime herein charged, the defendant was of such mental capacity as to distinguish between right and wrong; and[] (3) whether under the conditions [the] defendant was being subjected to on and before January 22, 1999, he was able to form the intent necessary under the law to be responsible for the act of which he is accused; and (4) to determine as to the murder charges whether[,] as to this defendant under the conditions he suffered[,] . . . malice could be implied "where no considerable provocation appears."

¶49. On November 14, 1999, Dr. Lott conducted a psychological evaluation of Brown and prepared a report of his findings. On November 19, 1999, Dr. Lott's report was sent to the circuit court judge. Dr. Lott acknowledged in his report each of the stated purposes of the court-ordered evaluation report. In his report, Dr. Lott concluded: "It is my opinion, to a reasonable degree of psychological certainty, that Mr. Brown has the sufficient present ability to confer with his attorney with a reasonable degree of rational understanding[,] and he has a good factual and rational understanding of the nature and object of the legal proceedings against him." However, a separate competency hearing was never conducted.

¶50. On November 29, 1999, the trial court conducted a plea hearing. The trial court asked Brown if he was under the influence of drugs or alcohol. Brown replied, "No, sir." As

somewhat of an afterthought, the State mentioned that a clinical psychologist, Dr. Lott, examined Brown and found him competent to stand trial. The judge confirmed that he had "seen" Dr. Lott's report. However, the prosecutor informed the court that he did not believe the report had been filed and that he would file the report following the conclusion of the plea hearing. Without the report having been filed, the trial court accepted Brown's guilty plea as knowingly, freely, understandingly, and voluntarily entered, and sentenced him to life in prison for murder and twenty years for manslaughter, to run concurrently with the life sentence.

¶51. Although Brown's PCR motion is procedurally barred, "errors affecting fundamental constitutional rights are excepted from the procedural bars of the [Uniform Postconviction Collateral Relief Act]." *Rowland v. State*, 42 So. 3d 503, 507 (¶12) (Miss. 2010). "[T[he prohibition against trying or convicting an incompetent defendant is fundamental to an adversary system of justice." *Smith*, 149 So. 3d at 1031 (¶8) (citing *Drope v. Missouri*, 420 U.S. 162, 172 (1975)). "The constitutional right not to be tried or convicted while incompetent is a component of a defendant's due-process right to a fair trial." *Id.* (citing *Pate v. Robinson*, 383 U.S. 375, 385 (1966)). "When the evidence raises sufficient doubt as to the defendant's competency to stand trial, the defendant is deprived of due process of law if the trial court fails to conduct a separate competency hearing." *Id*. at 1033 (¶15) (citing *Pate*, 383 U.S. at 385).

¶52. "Rule 9.06 of the Uniform Rules of Circuit and County Court Practice clearly

22

delineates the procedure for a trial court's determination of whether a potentially incompetent criminal defendant is mentally competent to stand trial." *Coleman v. State*, 127 So. 3d 161, 168 (¶20) (Miss. 2013). "Rule 9.06 is meant to ensure that a defendant's due process rights are not violated." *Id*. at 166 (¶13). Rule 9.06 provides in pertinent part:

> If before or during trial the court, of its own motion or upon motion of an attorney, has reasonable ground to believe that the defendant is incompetent to stand trial, the court shall order the defendant to submit to a mental examination by some competent psychiatrist selected by the court in accordance with § 99-13-11 of the Mississippi Code Annotated of 1972.
>
> *After the examination the court shall conduct a hearing to determine if the defendant is competent to stand trial*. After hearing all the evidence, the court shall weigh the evidence and make a determination of whether the defendant is competent to stand trial. If the court finds that the defendant is competent to stand trial, then the court shall make the finding a matter of record and the case will then proceed to trial. If the court finds that the defendant is incompetent to stand trial, then the court shall commit the defendant to the Mississippi State Hospital or other appropriate mental health facility.

(Emphasis added).

¶53. Simply put, "once the trial court has reasonable ground to believe the defendant is incompetent, Rule 9.06 mandates that the trial court shall order a mental evaluation followed by a competency hearing to determine whether the defendant is competent to stand trial." *Smith*, 149 So. 3d at 1033 (¶16). "In the face of this plain language [of Rule 9.06], it is evident that it would be error not to hold a competency hearing once a trial court orders a psychiatric evaluation to determine competency to stand trial." *Sanders v. State*, 9 So. 3d 1132, 1136 (¶16) (Miss. 2009).

¶54. Here, the majority clings to the "reasonable ground" language; however, the trial court

23

already ordered not one, but two mental examinations. Whether a mental examination is ordered or not hinges on whether a reasonable ground exists to order an examination. The competency hearing, on the other hand, is mandated. Rule 9.06 clearly states that "after the examination the court *shall* conduct a hearing to determine if the defendant is competent to stand trial." (Emphasis added). The language of Rule 9.06 leaves no room for discretion on whether or not to conduct a competency hearing once the trial court orders a mental examination. Here, the trial court ordered two mental examinations, only one of which actually occurred, and did not conduct a single competency hearing. As a result, Rule 9.06 was violated.

¶55.    In *Sanders*, the trial court ordered a mental evaluation of the defendant to determine his competency to stand trial. *Sanders*, 9 So. 3d at 1134 (¶8). The Mississippi Supreme Court held: "By finding that [the defendant's] motion for psychiatric examination was well taken and granting it, the trial court necessarily determined that some, if not all, of the assertions in [the defendant's] motion were sufficient to order a psychiatric examination of [the defendant]." *Id*. at 1137 (¶18).

¶56.    In *Coleman*, the defendant filed a motion for a psychiatric examination and/or treatment. *Coleman*, 127 So. 3d at 168 (¶20). The trial court granted the motion and the defendant submitted to the court-ordered examination. *Id.* However, the trial court did not hold a separate and timely hearing to determine the defendant's competence to stand trial. *Id.* The Court held: "The trial court's grant of [the defendant's] motion was conclusive of its

24

having found [a] reasonable ground to believe that [the defendant] was entitled to a mental examination and a competency hearing, based on the plain and forthright language of Rule 9.06." *Id.* at (¶19). Moreover, "[o]nce a mental health evaluation has occurred, the trial court must hold a separate competency hearing before the trial begins." *Id.* at (¶20). Because the trial court failed to hold a separate competency hearing under Rule 9.06, the court remanded the case to the trial court for a new trial. *Id.* at 162 (¶2).

¶57. Similarly, the trial court's grant of Brown's and the State's motions for mental examinations was conclusive of its having found a reasonable ground that Brown was entitled to a mental examination and competency hearing. Only the court-ordered examination entered on the State's motion for a psychiatric examination actually occurred. The court-ordered examination to take place at the Mississippi State Hospital never occurred. The majority notes that the orders did not specifically state that reasonable grounds exist to believe Brown was incompetent at the time, but the orders themselves are conclusive of the trial court's having found a reasonable ground. *Id.* at 168 (¶19).

¶58. The majority finds that nothing in the plea-hearing transcripts indicates that the trial court should have been alerted Brown might be suffering from mental issues. I disagree. Although Brown represented to the court during the plea colloquy that he was not under the influence of any medication, medical records and Dr. Lott's report reveal that Brown was receiving medication. Specifically, Brown was prescribed a psychotropic antidepressant, elavil (generic name: amitriptyline), by Dr. Dale L. Wing on September 24, 1999. Dr. Wing

25

started Brown on twenty-five milligrams of elavil. At the time of Dr. Lott's evaluation, Brown's dosage had been increased to fifty milligrams. Notably, Dr. Lott's evaluation was not filed with the trial court prior to his plea hearing. Dr. Lott's report clearly stated that Brown was on medication, contrary to his representation to the trial court. The trial court did not question this misrepresentation despite having "seen" the report, which plainly revealed the inconsistency. Moreover, Dr. Lott's report states that Brown cut his wrists in jail prior to trial; however, this alleged suicide attempt was not discussed during the plea colloquy. The prescribed psychotropic medications and the wrist cutting certainly should have alerted the trial court that Brown might be suffering from some mental issues. Nonetheless, even one court-ordered examination for the purpose of determining the defendant's competency is conclusive of the trial court's having reasonable grounds to doubt Brown's competency and entitles Brown to a competency hearing based on the plain language of Rule 9.06. *See Coleman*, 127 So. 3d at 168 (¶19).

¶59. In *Smith*, on the day of trial, the defendant orally moved for a continuance and a psychiatric examination. *Smith*, 149 So. 3d at 1029 (¶2). The trial court entered an order compelling the defendant to undergo a psychiatric evaluation. *Id*. at 1030 (¶2). The record was unclear as to why the trial court entered the order. *Id*. at 1034 (¶18). The examination was never done, and the defendant later pled guilty. *Id.* at 1029-30 (¶2). Because of the ambiguity surrounding the reason the trial court ordered a mental examination, the Court remanded the case for an evidentiary hearing. *Id.* at 1031 (¶9). The Court concluded that "if,

after the evidentiary hearing, the trial court determines that the purpose of the court-ordered mental evaluation was to determine Smith's competency to stand trial, Smith's conviction cannot stand, and Smith must be either retried or institutionalized following a mental evaluation and competency hearing under Rule 9.06." *Id.* at 1035 (¶19). Here, both orders unambiguously state that a purpose of the mental examinations was to determine Brown's competency to stand trial.

¶60.    The majority seems to find that Brown waived his claim of incompetency for failing to raise it at the plea hearing. However, the United States Supreme Court in *Pate*, 383 U.S. 375, held that "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently" waive his right to have the court determine his capacity to stand trial.

¶61.    The majority, relying on the holding in *Manning v. State*, 929 So. 2d 885, 898-99 (¶35) (Miss. 2006), holds that *Sanders* does not apply retroactively because it announced a procedural rule. The majority concludes that *Sanders*'s requiring a competency hearing did not control at the time Brown entered his guilty plea. I disagree. The Mississippi Supreme Court applied the holding in *Sanders* retroactively in a PCR case where the movant was convicted in 1999. *See Goodin v. State*, 102 So. 3d 1102, 1105, 1118-19 (¶¶3, 48-50) (Miss. 2012). The majority distinguishes *Goodin* from this case by finding that the movant in *Goodin* claimed ineffective assistance of counsel because the defense attorney failed to ensure that the defendant was afforded a competency hearing, which was required by Rule

27

9.06. Consequently, under the majority's view, Brown could circumvent this retroactive bar, and would be better served by filing a PCR motion alleging ineffective assistance of counsel, essentially alleging the same set of facts, but assigning error on the part of his counsel rather than the trial court for failing to comply with Rule 9.06. I would not hold that *Sanders* applies retroactively depending on the label of the claim.

¶62.     Moreover, "[a] rule which is not enforced is no rule." *Patton v. State*, 34 So. 3d 563, 571 (¶24) (Miss. 2010) (quoting *Box v. State*, 437 So. 2d 19, 21 (Miss. 1983)). "And when a rule that we promulgated says a trial court 'shall' do a thing, justice and fairness demand that, absent extremely unusual circumstances, we either require trial courts to do it, or change the rule." *Id*. at 572 (¶25). Rule 9.06 was in effect at the time of Brown's guilty plea. The rule was adopted effective May 1, 1995. It is undeniable that the trial court failed to comply with the mandatory requirements of Rule 9.06.

¶63.     In any event, the trial court never held a competency hearing, which is required by the "shall" language of Rule 9.06. Consequently, the trial court's failure to hold a separate competency hearing despite ordering two examinations prior to Brown's guilty plea was a violation of his constitutional right to due process of law and is reversible error. The appropriate remedy for failure to hold a competency hearing is a new trial, not a retrospective competency hearing. *See Coleman*, 127 So. 3d at 168 (¶20). Therefore, I would reverse the decision of the trial court, vacate Brown's conviction, and he must be either retried or institutionalized following a mental evaluation and competency hearing under Rule 9.06.

28